# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 21-1955V

| | |
|---|---|
| RYAN CARROLL,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Chief Special Master Corcoran<br><br>Filed: December 10, 2025 |

*Braden Andrew Blumenstiel*, The Law Office of DuPont & Blumenstiel, Dublin, OH, for Petitioner.

*Alexa Roggenkamp*, U.S. Department of Justice, Washington, DC, for Respondent.

### **FINDINGS OF FACT AND CONCLUSIONS OF LAW**[1]

On October 4, 2021, Ryan Carroll filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act").[3] Petitioner alleges that he suffered a right shoulder injury related to vaccine administration ("SIRVA"), a defined Table Injury, after receiving an influenza ("flu") vaccine on October 4, 2018. Amended Petition at ¶¶ 1, 14.

---

[1] Because this Fact Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Fact Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] On August 24, 2022, Petitioner filed an amended petition, providing additional detail and medical records citation. ECF No. 22.

For the reasons set forth below, I find that certain elements of Petitioner's Table SIRVA claim cannot be met, and therefore dismissal of the SIRVA claim is warranted. A causation-in-fact version of the claim may still be viable, however.

## I. Relevant Procedural History

Along with the Petition, Mr. Carroll filed an affidavit and some of the medical records required by the Vaccine Act. Exs. 1-3, ECF No. 1; *see* Section 11(c). Over the subsequent ten-month period, he filed additional medical records. Ex. 5, filed Jan. 24, 2022, ECF No. 9; Ex. 8, filed July 21, 2022, ECF No. 15. On July 27, 2022, the case was activated and assigned to the "Special Processing Unit" (OSM's adjudicatory system for resolution of cases deemed likely to settle). ECF No. 18.

Approximately one-year later, Respondent filed a status report identifying needed medical records and specifying the factual issues to be addressed. ECF No. 24. From mid-July through late September 2023, Petitioner provided his outstanding medical records, certified copies of medical records already filed, an affidavit, and additional documentation regarding insurance benefits and medication prescribed in 2016. Ex. 6-7, filed Aug. 22, 2023, ECF No. 25; Ex. 9, filed Aug. 24, 2023, ECF No. 26; Ex. 10, filed Sept. 29, 2023, ECF No. 30.

From late September 2023 through early March 2024, the parties attempted to reach an informal settlement. *See,* e.g., Status Report, filed Jan. 5, 2024, ECF No. 36. On March 1, 2024, Petitioner informed me the parties had reached an impasse in their settlement discussions. Status Report, ECF No. 38.

In his Rule 4(c) Report, filed on March 22, 2024, Respondent detailed multiple bases for his objection to compensation. ECF No. 39. In response, I issued a fact ruling rejecting Respondent's argument related to pain onset, but ordering Petitioner to provide additional evidence related to the issues of injury severity and whether range of motion ("ROM") limits could be established. ECF No. 42.

After renewing settlement discussions, the parties again reached an impasse. Joint Status Report, dated Oct. 7, 2025, ECF No. 50. Petitioner addressed the issues of symptom duration and ROM limitations in a 2025 status report filed on February 28, 2025 (ECF No. 41) and affidavits from his wife and himself and a show cause response filed on August 13, 2025 (ECF Nos. 47-48).

2

## II.     The Parties' Arguments

At issue is whether Petitioner experienced six-months of injury sequelae - required for both Table and non-Table claims (the "severity" requirement)[4] - and limitations in ROM, which is a specified element defined in the Qualifications and Aids to Interpretation ("QAI") pertinent to a Table SIRVA.[5]

Emphasizing Petitioner's April 9, 2019 statement contained in a treatment record (that he could work out without pain and stopped taking pain medication the previous week, as well as the lack of treatment thereafter), Respondent argues that Petitioner cannot establish severity. *Id.* at 5-6. He maintains that two instances of shoulder pain experienced by Petitioner in 2020 (more than fifteen months later) cannot be linked to his earlier symptoms and vaccination. *Id.* at 6. Regarding ROM, Respondent insists that "objective testing, *and [P]etitioner's own statements* consistently showed that he had full range of motion in his right shoulder." *Id.* (citing Ex. 3 at 26, 29; Ex. 7b at 196) (emphasis in the original).

Petitioner asserts in reaction that the record from the April 9, 2019 visit actually supports severity. Given that the visit occurred on a Tuesday, he contends his statements could be interrupted as signaling pain relief that occurred later in the week - a few days after, rather than before, the six-month mark for post-vaccination onset severity (April 4, 2019). In his supplemental affidavit, he adds that he recalled stopping pain medication on April 6, 2019 (Ex. 12 at ¶ 7), and his wife recalls instances when Petitioner modified his behavior to avoid shoulder pain through October 2019 (Ex. 13 at ¶¶ 13-15). Additionally, Petitioner argues that "[i]t is common (in fact, it is typical) for people to cease taking prescription pain medication before their pain and limitations are completely resolved." Ex. 12 at ¶ 3; *accord. id* at 4 (characterizing his pain medication as "addictive").

Regarding lack of evidence of ROM limitations, Petitioner emphasizes only one medical record entry noting "some hesitancy when initiating movement on his right side, and pain at 90 degrees with both forward and side lifting on the right side." Status Report at 1 (citing Ex. 3 at 29). But although his wife recalled observing her husband's pain and limitations both before and after April 9, 2019, she described specific examples illustrating only shoulder pain. Ex. 13 at ¶¶ 8-9, 13-14.

---

[4] Section 11(c)(1)(D)(i) (requiring six-month sequela for claims not involving death or an inpatient hospitalization and surgical intervention).

[5] *Bolick v. Sec'y of Health & Hum. Servs.,* No. 20-893V, 2023 WL 8187307, at *6 (Fed. Cl. Spec. Mstr. Oct. 19, 2023) (finding reduced ROM is required under 42 C.F.R. § 100.3(c)(10) (2017)).

**III.     Authority**

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998).

The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### IV.    Findings of Fact

I make these findings related to severity and limited ROM after a complete review of the record, including consideration of all medical records, affidavits, and additional evidence filed. Specifically, I highlight the following evidence:

- Petitioner has filed medical records from only one visit prior to the vaccination – an annual physical attended in May 2018. Ex. 6. Petitioner's sole complaint at that time was the frequent need to urinate during the night. *Id.* at 4. He was instructed to curtail his water intake during the evening, and told that a urology referral could be provided if the issue continued. *Id.*

- On October 4, 2018, Petitioner (then 24 years old) received the flu vaccine alleged as causal intramuscularly in his right deltoid. Ex. 1. In his sworn declaration, Petitioner explained that he received the vaccine at work. Ex. 2 at ¶¶ 5-6.

- Almost three months later, on December 28, 2018, Petitioner visited his primary care physician ("PCP") complaining of "shoulder pain since 10/4/18 after receiving the flu vaccine to the right deltoid." Ex. 3 at 30. Reporting

5

that his "pain [wa]s located in the upper portion of the shoulder, [h]e states that the injection felt higher than his previous flu vaccine." *Id.* Although he reported that his pain was worsening, Petitioner was not then taking any pain medication. *Id.*

- An examination revealed pain upon palpitation (only at the injection site) but "full ROM bilaterally." Ex. 3 at 29. The PCP also observed "some hesitancy with the right side at initiation of movement . . .pain at 90 degrees with both forward and side lifting with the right side, . . . [and] pain decreased once above the 90 degree point." *Id.* Under "Physical Exam," it was again noted that Petitioner "exhibit[ed] tenderness and pain," but "[n]ormal range of motion." *Id.* at 31. Stating that he would refer him to an orthopedist or for physical therapy ("PT") if his pain persisted, the PCP diagnosed Petitioner with bursitis and prescribed 800 milligrams of ibuprofen three times a day for ten days. *Id.* at 29.

- Ten days later, on January 7, 2019, Petitioner called his PCP and reported that his pain had improved, but that "he does have full ROM." Ex. 7b[6] at 196. He recounted soreness in the morning after missing one ibuprofen dose the prior evening. The PCP advised him to continue taking 800 milligrams of ibuprofen for an additional seven to ten days, to continue his exercises, and to call back in ten to fourteen days. *Id.*

- On April 9, 2019 (now six-months and five days post-vaccination), Petitioner attended a second appointment with his PCP for follow-up of his shoulder pain. Ex. 3 at 25. He stated that "he has not taken the ibuprofen since last week . . . [and] has been able to workouts [sic] without pain." *Id.* Upon examination, Petitioner exhibited "no deficiencies with normal ROM . . . [and] no pain with palpitation." *Id.* at 26. The PCP advised Petitioner "to continue to do his shoulder exercises and to slow[ly] incorporate heavier weights as he so choses." *Id.*

- Less than one month later, on May 1, 2019, Petitioner visited his PCP for an annual physical. Ex. 3 at 1. Stating that "he is feeling good," Petitioner "report[ed] that he is active with fitness 3-4 times a week to include weight and cardio training." *Id.* at 2. Acknowledging that his "diet could improve," Petitioner expressed concerns only regarding his diet and sleep. *Id.*

---

[6] Petitioner has filed his updated PCP medical records in two exhibits, labeled Exhibits 7a and 7b. ECF No. 25. However, he correctly used consecutive pagination for this entire Exhibit 7.

6

- Upon examination, the PCP observed only some left ear wax buildup. Ex. 3 at 3. "Normal range of motion" was listed under the musculoskeletal heading. *Id.* The PCP ordered labs and prescribed melatonin. *Id.* There is no mention of pain, including right shoulder pain, in this record. *Id.* 1-23.

- On May 9, 2019, Petitioner was informed, through the patient portal, that his labs looked good. Ex. 7b at 149.

- More than fourteen months after his annual physical, Petitioner messaged his PCP regarding a July 19, 2020 visit to the emergency room ("ER") for a fever, chills, fatigue, and body aches that began five days earlier and a sore neck that began that same day. Ex. 7b at 147. Having taken a COVID test a few days earlier, the results of which were not yet known, and after being told he may have meningitis, Petitioner went to the ER as instructed. *Id.* at 147-48. He was discharged after a rapid COVID performed at the ER was negative, and his symptoms were determined to be mild – the fever measuring 99 degrees. *Id.* at 148. Acknowledging that his symptoms "continue to be pretty mild" such as his neck soreness which had not reduced his range of motion (presumedly of his neck), Petitioner reported that he also had developed a rash. *Id.*

- On August 5, 2020, Petitioner informed his PCP, through the patient portal, that he "was recently diagnosed with Bell's Palsy during an ER visit on August 1st." Ex. 7b at 145. In a follow-up message on August 11, 2020, he stated he "was doing pretty well until [he] finished a couple of [his] prescriptions from the ER visit . . . [and] started getting joint pain on [his] right knee, shoulder, and some fingers" beginning yesterday. *Id.*

- Three months later, on November 4, 2020, Petitioner called his PCP, "stat[ing] that he [wa]s having right shoulder pain and he is assuming it is Bursitis due to him having it before." Ex. 7a at 94. When instructed to take over the counter medication (Aleve), Petitioner responded that "he tried OTC ibuprofen, and it only helped a little." *Id.* at 95.

- On November 11, 2020, the PCP followed-up by phone. Ex. 7a at 95. There is no evidence showing that Petitioner returned the call.

- Three months later, on February 26, 2021, Petitioner was seen by his PCP for reddening of the tips of his toes that were initially sore and swollen for the past three weeks. Ex. 7a at 69. It was determined that his symptoms, termed "COVID toes," may be related to COVID symptoms he experienced

7

- a few months prior. *Id.* at 69, 72. Petitioner was sent for COVID testing, advised to isolate, and told to return for treatment if his symptoms continued. *Id.* at 72-73. It appears this condition resolved without further treatment, and there is nothing in this record related to shoulder pain. *Id.* at 68-91.

- On March 22, 2021, Petitioner inquired as to the safety and type of COVID vaccine he should receive. Ex. 7a at 67.

- On August 24, 2021, Petitioner was seen by his PCP for an annual physical. Ex. 7a at 37. Seeking biometrical screening for his employer, Petitioner reported that he "[f]eels well feeling well overall. . . [with] [n]o other concerns at this time." *Id.* The PCP ordered labs and instructed Petitioner to return in one year. *Id.* at 41.

- In his initial affidavit, executed on October 1, 2021, Petitioner stated that "[i]mmediately after receiving the Flu vaccine, [he] began to experience shoulder pain that [he] associated with normal soreness following a shot, . . . [but] got worse over time." Ex. 2 at ¶ 9. He also maintained that his "vaccine-related symptoms lasted greater than 6 months." *Id.* at ¶ 16.

- In April 2022, Petitioner was seen for right knee pain Ex. 7a at 9-10, 14, 35. Again, there is no mention of right shoulder pain in this record. *Id* at 10-34.

- In his supplemental affidavit, executed on August 13, 2025, Petitioner stated that he stopped taking pain medication when his pain "persisted but became bearable," recalling that his last dose was April 6, 2019. Ex. 12 at ¶ 7. Adding that on April 9, 2019, his PCP instructed him to continue performing home exercises and to gradually increase the weights he used while working out, Petitioner recalled that "[t]o the best of [his] memory, the pain lasted for over a week after the follow-up visit on April 9, 2019." *Id.* at ¶¶ 8-9.

- In her affidavit, also executed on August 13, 2025, Petitioner's wife stated that she observed her husband experiencing "pain and limitations" after his vaccination on October 4, 2018. Ex. 13 at ¶ 8. Specifically, she provided examples such as his favoring of his right arm, carrying more weigh with his left arm and his backpack on his left shoulder when hiking. *Id.* at ¶ 9. Acknowledging that she was not present at her husband's last PCP visit on April 9, 2019, and his symptoms had improved (*id.* at ¶¶ 11-12), she insisted that she "do[es] not believe Ryan's symptoms had completely resolved by

8

that time." *Id.* at ¶ 11. Thereafter, she recalled him using cold and/or heat packs and mentioning right shoulder soreness. *Id.* at ¶ 14. Petitioner's wife estimated that his symptoms continued "until approximately October 2019." *Id.* at ¶ 15.

### A.   *Severity*

To satisfy the Vaccine Act's severity requirement in this case, Petitioner must show that he suffered the residual effects of his alleged SIRVA injury for more than six-months after onset.[7] Section 11(c)(1)(D)(i) (severity requirement for cases not involving death or inpatient hospitalization and surgical intervention). Thus, he must establish that his sequela continued beyond at least April 4, 2019 (assuming an immediate onset – which I have determined that the record preponderantly supports).

At his last PCP appointment on Tuesday, April 9, 2019, a mere five days after the six-month severity mark, Petitioner reported that he had not taken ibuprofen since last week and was able to work out without pain. Ex. 3 at 25. I agree this entry could mean that Petitioner stopped taking ibuprofen any time between April 2nd through April 6th. Given that it would be illogical for him to continue this medication if not experiencing at least minimal pain, this entry supports sequela through April 2nd, and possibly April 6th.

There is other evidence establishing Petitioner's symptoms did not continue beyond that point, however. He reported being able to work out without pain, for example, and did not seek treatment thereafter. Additionally, Petitioner's contention that he ceased medication even when still experiencing pain to avoid becoming dependent, is unpersuasive given that he was taking ibuprofen, rather than an addictive narcotic such as an opioid.[8]

Because the April 9, 2019 record entry could easily be describing a last dosage of ibuprofen on Thursday, Apil 4th or Friday, April 5th, and in light of the Vaccine Act's

---

[7] Although some special masters have interpreted the language of Section 11(c)(1)(D)(i) as requiring sequelae to be measured from the date of vaccination (which inherently occurs before symptoms onset), "I believe a more reasonable interpretation is that, since the six-month period measures severity of injury, it cannot begin *before* the time of injury, and hence is properly measured from the date of *onset*." *Castellanos v. Sec'y of Health & Hum. Servs.,* No. 19-1710V, 2022 WL 1482497, at *2 n.5 (Fed. Cl. Spec. Mstr. Mar. 30, 2022); *But see Herren v. Sec'y of Health & Hum. Servs.,* No. 13-1000V, 2014 WL 3889070, at *2 (Fed. Cl. Spec. Mstr. Feb. 18, 2014) (stating the contrary view – that the six-month period should be calculated from date of vaccination).

[8] In contrast to the addictive effects of narcotics, use disorder linked to ibuprofen is extremely rare. *See* https://pmc.ncbi.nlm.nih.gov/articles/PMC5370578 (last visited Dec. 9, 2025).

favoritism for claimants in cases involving a close factual call,[9] I find this record entry is sufficient to establish the needed severity. But the preponderant evidence does not support sequela *beyond* that point. Thus, even if Petitioner can satisfy the other requirements of causation, his compensation amount for pain and suffering will not be significant.

### B.   *Limited ROM*

Although severity has been established, Petitioner has failed to provide the evidence needed to preponderantly demonstrate limited ROM. Rather, during the treatment he received, Petitioner was consistently observed to have *full ROM*. Ex. 3 at 29, 25-26, 3 (in chronologic order). In a phone call on January 7, 2019, he acknowledged this fact himself. Ex. 7b at 196.

The only entries showing any difficulties with ROM are mentions of *hesitancy* before movement, and pain at 90 degrees which decreased as the movement continued. Ex. 3 at 29. But I have previously determined that pain *with* motion will not satisfy this Table SIRVA requirement. *Petty v. Sec'y of Health & Hum. Servs.,* No. 19-1332V, 2024 WL 5381961, at *5 (Fed. Cl. Spec. Mstr. Sept. 24, 2024). Rather, a demonstrated *outright* reduction of ROM is necessary – not that a claimant is reluctant to move his shoulder in anticipation of pain. *Id.* Thus, these entries are not sufficient to meet this element of a Table SIRVA. Because all elements must be satisfied, Petitioner cannot receive compensation for his alleged SIRVA, and the Table claim is properly dismissed.

A petitioner's failure to establish a Table injury does not necessarily constitute the end of a case under all circumstances, however, because he or she might well be able to establish a non-Table claim for either causation-in-fact or significant aggravation. *See Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274 (Fed. Cir. 2005); *W.C. v. Sec'y of Health & Hum. Servs.*, 704 F.3d 1352, 1357 (Fed. Cir. 2013) (citing *Loving v. Sec'y of Health & Hum. Servs.*, 86 Fed. Cl. 135, 144 (2009)).

Such a claim could probably be mounted on the basis of the evidence already in this case, since Petitioner can likely demonstrate a sufficiently-severe, if minimally-treated, shoulder injury that could be linked to vaccination. But formal resolution regarding

---

[9] In creating the Vaccine Program, Congress envisioned a system "in which close calls regarding causation are resolved in favor of injured claimants." *Althen v. Sec'y of Health & Hum. Servs.,* 418 F.3d 1274, 1280 (Fed. Cir. 2005); *accord. Kane v. Sec'y of Health & Hum. Servs.*, No. 21-0516V, 2023 WL 2885340, at *5 (Fed. Cl. Spec. Mstr. Mar. 7, 2023) (applying "close call" considerations when determining severity).

causation will likely require further review and most likely the retention of experts, which I am not inclined to authorize in the SPU.

## Conclusion

Petitioner has established the six-month severity needed to continue his claim, but has failed to satisfy the requirements for a Table SIRVA – specifically limited ROM. **Accordingly, his Table SIRVA claim is dismissed.**

Given the mild nature and short duration of Petitioner's symptoms, any compensation will not be significant. Thus, the parties should make one more attempt to reach an informal settlement in this case, before I reassign it out of SPU. **The parties shall file a joint status report indicating whether they believe an informal settlement could be reached in this case and updating me on their current efforts by no later than <u>Thursday, January 15, 2026</u>**.

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master